IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JOSHAWA WEBB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:07-CV-03290 |
| | ) | |
| THE UNITED STATES OF AMERICA, *et al*. | ) | The Honorable Judge Boyko |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR RELIEF FROM
SUMMARY JUDGMENT RULINGS**

Jon Loevy
Joel Feldman
Debra Loevy-Reyes
Attorneys for Plaintiff
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    The Standards for Reconsideration of Summary Judgment . . . . . . . . . . . . . . . . . 3

    II.    Defendants' New Document Disclosures Demonstrate Their Improper Withholding of Evidence, Warranting Reversal of Summary Judgment . . . . . . . . 4

        A.    A Summary of the Improperly Withheld Evidence . . . . . . . . . . . . . . . . . 5

        B.    Reversal Under is Warranted Because Defendants' New Disclosure Reveals That They Continue to Withhold Relevant Documents . . . . . . . 17

        C.    The Relevant Standards For Plaintiff's Fourth Amendment Claims . . . . 20

                1.    The Standards for Fourth Amendment Claims Generally . . . . . . 21

                2.    Malicious Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                3.    Unlawful Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                4.    Fabrication of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                5.    Conspiracy to Deny Fourth Amendment Rights . . . . . . . . . . . . . 24

                6.    In Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        D.    Reversal of Summary Judgment Is Warranted Based on the Improperly Withheld Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

## TABLE OF AUTHORITIES

*Ahlers v. Schebil,* 188 F.3d 365 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Alman v. Reed,* 703 F.3d 887 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*American Civil Liberties Union of Kentucky v. McCreary County, Ky.,*
    607 F.3d 439 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Army v. Collins,* 2012 WL 2913736 (6th Cir., July 18, 2012) . . . . . . . . . . . . . . . . . . . . . . . 23

*Bazzi v. City of Dearborn*, 658 F.3d 598 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Beck v. Ohio*, 379 U.S. 89 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cameron v. Ohio*, 344 F. App'x 115 (6th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Drogosch v. Metcalf*, 557 F.3d 372 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fox v. DeSoto*, 489 F.3d 227 (6th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ghaith v. Rauschenberger*, 2012 WL 3289922 (6th Cir., Aug. 14, 2012) . . . . . . . . . . . . . . . 21

*Greene v. Reeves,* 80 F.3d 1101 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gregory v. City of Louisville,* 444 F.3d 735 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Hale v. Kart,* 396 F.3d 721 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hardesty v. Hamburg Twp.,* 461 F.3d 646 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Henry v. United States*, 361 U.S. 98 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hill v. McIntyre*, 884 F.2d 271 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Illinois v. Gates*, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Juriss v. McGowan*, 957 F.2d 345 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Logsdon v. Hains*, 492 F.3d 334 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Malley v. Briggs,* 475 U.S. 3355 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . 28

*Myers v. Potter,* 422 F.3d 347 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Revis v. Meldrum,* 489 F.3d 273 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Russell v. GTE Gov't Sys. Corp.,* 141 F. App'x 429 (6th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . 3

*Smith v. Barber*, 195 F. Supp. 2d 1264 (D. Kan. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Stricker v. Township of Cambridge*, 2013 WL 141695 (6th Cir., Jan. 14, 2013) . . . . . . . . . . . 23

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*United States v. Newsome*, 2012 WL 5440027 (6th Cir., Nov. 8, 2012) . . . . . . . . . . . . . . . . . . 21

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Helton,* 314 F.3d 812 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Carpenter,* 360 F.3d 591 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Vakilian v. Shaw,* 335 F.3d 509 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Weberg v. Franks,* 229 F.3d 514 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Yancey v. Carroll County,* 876 F.2d 1238 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iii

## Statement of the Issues

This case comes before the Court on plaintiff's motion seeking relief from the Court's summary judgment orders, granting summary judgment based on assertions of qualified immunity, after limited discovery.  (Doc. Nos. 89, 93, 151, 156, 190).[1]  The issues before the Court are as follows:

(1)    Is the new evidence, improperly withheld by defendants but now presented in this motion, sufficient to warrant reversal of summary judgment on the basis of qualified immunity?

(2)    Alternatively, where defendants affirmatively and repeatedly misinformed the Court about the extent of their discovery disclosures, hiding the fact that they were unilaterally withholding documents highly relevant to the issue of qualified immunity, is reconsideration of summary judgment warranted?

---

[1]  Insomuch as this Motion bears directly on the matters raised in the pending motions filed by the various defendants (Doc. No. 193 and FTCA case [1:10-cv-1669] Doc. No. 23), plaintiff also submits this Motion (and Plaintiff's Showing Of Cause Why His State Law Claims Should Not Be Dismissed [Doc. No. 194]) in response to those motions.

**Summary of the Argument**

This Court granted defendants summary judgment on the issue of qualified immunity, after allowing only limited discovery and relying on defendants' assurances that they had tendered to plaintiff the relevant investigative files in their entirety.  It turns out, however that the Court's adjudication was based on a faulty premise because the defendants' claim to have turned over all of the relevant files was simply false.  At virtually the same time as summary judgment was favorably resolved for defendants, a wealth of new documents surfaced revealing what plaintiff has claimed all along – defendants were unilaterally withholding a cache of evidence in their exclusive control, relevant to qualified immunity.  In a parallel matter involving the same defendants, the same underlying investigations, and the same conspiracy allegations, Defendant Richland County Sheriff's Office recently turned over 38 CD-ROMS and the United States tendered 2,230 pages of documents, many of which would help support plaintiff's claims and defeat qualified immunity.  Those documents contain new defendant admissions about testifying falsely in support of their deceptive informant, perpetuating false reporting, and being aware of their informant's corruption long before plaintiff's arrest, as well as defendants accusing each other as responsible for the subterfuge – all bearing directly on defendants' qualified immunity assertions.  Summary judgment without any consideration of this withheld evidence would be improper.

This Court ruled on a gravely incomplete record, and a serious miscarriage of justice would result if the documents defendants improperly withheld are never considered.  The government won summary judgment by purporting to tender complete files while withholding relevant documents – they should not be rewarded for their omissions, and a ruling granting

2

summary judgment without consideration of the improperly withheld documents is untenable.

**Argument**

I.      **The Standards for Reconsideration of Summary Judgment**

Where, as is the case here, the district court has not yet entered a final judgment when presented with a motion for reconsideration of summary judgment the Court is "free to reconsider or reverse its decision for any reason." *American Civil Liberties Union of Kentucky v. McCreary County, Ky.*, 607 F.3d 439, 450 (6th Cir. 2010), *citing Cameron v. Ohio*, 344 F. App'x 115, 118 (6th Cir.2009) (*citing Russell v. GTE Gov't Sys. Corp.*, 141 F. App'x 429, 436 (6th Cir.2005)). Alternatively, the Court may consider such a motion under Federal Rule of Civil Procedure 59(e), even though it was filed prior to the actual entry of final judgment. *American Civil Liberties Union of Kentucky*, 607 F.3d at 450, *citing Smith v. Hudson*, 600 F.2d 60, 62 (6th Cir.1979).

Under Rule 59(e), reconsideration of summary judgment is proper, among other reasons, where there is newly discovered evidence or a need to prevent manifest injustice. *Id.* (citations omitted).  Both reasons are strongly implicated here.  As detailed below, the evidence set forth in this motion is more than enough to defeat defendants' summary judgment motions on the basis of qualified immunity.  Moreover, it is profoundly unfair and legally unsupportable to allow defendants to hide the documents relevant to qualified immunity, while the Court decides the issue under the false impression that all of relevant documents have been shared.

Here, defendants affirmatively misinformed the Court that they had tendered "the entire internal files of the United States Attorney's Office in Cleveland, United States Drug Enforcement Administration, Richland County Sheriff's Office and the other law enforcement agencies involved in the Mansfield cases."  Doc. 158 at 11; *see also Id.*  Doc. 159 at 3; Doc. 160 at 2; Doc.

3

161 at 2.[2]  The belatedly produced documents summarized below reveal that these claims were

patently false.  A summary judgment ruling that fails to consider the belatedly revealed documents

and defendants' serious breach is simply unsustainable.

## II.    Defendants' New Document Disclosures Demonstrate Their Improper Withholding of Evidence, Warranting Reversal of Summary Judgment

Immediately before summary judgment was granted in this case, defendants produced 38

CD-ROMS and thousands of pages of documents in a parallel matter, *Westerfield v. Lucas, et al.*,

Case No. 1:07CV3518 (Gaughan, J.), involving the same defendants, the same underlying

investigations, the same confidential informant, Jerrell Bray, and the same conspiracy allegations.

Many of those documents appear to be directly relevant to the summary judgment briefing in this

case.  For example, the new documents contain:  Defendant Ansari's statement that he believed

Bray stole money from the government during a controlled buy, but Defendant Lucas covered for

Bray and buried the incident; Defendant Metcalf's admission that he presented a false affidavit to

a state court judge in furtherance of the investigation; and Defendant Lucas' admission to his

supervisor that he knew Bray stole government funds during a controlled buy.

Additionally, the disclosure alludes to huge swaths of documents that would certainly be

considered part of the supposedly complete files tendered that have still never been disclosed,

such as Defendant Lucas' "operational plans" for each of the investigation's deals and DEA forms

12 and 356 documenting how much the corrupt informant was paid for each transaction and how

---

[2] As recently as May 2013, Defendant Lucas presented this same false overstatement to the Sixth Circuit, regarding the same faulty document disclosure.  *See Robertson, et al. v. Lucas, et al.*, Case 12-3877 (Doc. 006111701379 at 61).  Defendants Verhiley and Cross similarly misinformed the Sixth Circuit that the original disclosure comprised "the entire" internal files of the United States Attorney's Office, the DEA, and Richland County Sheriff's Office and that "all investigative reports" had been tendered.  *Robertson*, (Doc. 006111708126 at 16).

each controlled drug purchase was funded.  Such documents would support plaintiff's theory of the case that defendants knew their informant was stealing government money throughout the investigation.  The withheld documents also reveal that the DEA maintained a confidential source file regarding the informant which plaintiff has still never seen, but which would likely support either that defendants knew their informant was systematically unreliable or that they were covering up the evidence of his subterfuge.

This is not a case where plaintiff belatedly seeks to remedy his own failure to pursue discovery.  Rather, plaintiff aggressively pursued his right to discovery, filing a very detailed Rule 56 affidavit outlining his discovery needs.  The problem here arises not from plaintiff's lapse, but from defendants' misinformation to the district court about the completeness of defendants' discovery disclosure.

### A.    A Summary of the Improperly Withheld Evidence

Among the newly produced evidence is a stunningly powerful report issued by the United States Department of Justice, Office of the Inspector General ("OIG"), setting forth extensive evidence of Defendant Lucas' intentional misconduct throughout the Mansfield investigation. This 44-page detailed report, with 248 exhibits attached in support, delineates substantiated allegations against Defendant Lucas, finding him guilty of issuing numerous false reports throughout the investigation and testifying falsely at two criminal trials and one detention hearing. (Exhibit A, OIG amended final report, 1/21/11).  The report summarizes Lucas' deceptions in support of his false informant, Jerrell Bray:

5

The OIG and OPR investigation developed significant evidence that Lucas put false or erroneous information into some of his DEA-6s of the buys in the Mansfield investigation, that he testified falsely during the detention hearing and two trials that resulted from the Mansfield investigation and prosecution, and that he failed to report to his management, the prosecuting AUSA, or the defendants or their attorneys information which was exculpatory to one of the defendants, and information which was likely to have negatively impacted Lucas's own, and Bray's credibility.  The OIG and OPR, as well as the USAO for the Western District of Pennsylvania, concluded that Lucas wrote the false statements, testified falsely, and failed to report the exculpatory and negative information to strengthen the cases and inculpate the charged persons.  They also concluded that Lucas engaged in misconduct by filling the "holes" in the cases by, among other things, including in his DEA-6s and in testimony, statements claiming to have made observations he did not make, and claiming to have taken actions that he did not take.  Lucas's false reports and testimony corroborated Bray's accounts of the drug deals after Lucas became aware that some defendants alleged that Bray lied or was mistaken, so Lucas wrote and testified as he did to corroborate Bray and "cover-up" Bray's other misconduct.

(Exhibit A, OIG amended final report, 1/21/11, at 5-6, footnote omitted).  The report then details

evidence, case by case, supporting these findings.  Much of this evidence inculpates the other

defendants as well as Lucas.

In a newly produced sworn interview with the OIG, Defendant Lucas admits that his

reports violated DEA policy, contained significant omissions, misconstrued summations of what

Lucas had been told as if they were personal observations, contained false information, and

contradicted his later trial testimony.  (Exhibit B, Transcript of Lee Lucas Compelled

Administrative Interview at USA001-23390, 23414-18, 23421, 23432-33, 23436-38, 23448-50,

23455).  Defendant Lucas also admits that his reports intentionally omitted key information such

as when, how and by whom identifications were made; which officer followed the informant;

whether the informant was searched and, if so, by whom; what telephone numbers the informant

called to set up deals; which officers participated during specific parts of the investigation;

descriptions of post-buy surveillance; whether a suspect was armed; and the fact that Lucas

6

believed his informant lied after one of the deals. (*Id*. at USA001-23382-85, 23392-95, 23411-14, 23416, 23419, 23425-27, 23429-31, 23436, 23440-2, 23443-45, 23451-52, 23454-55).  Further, Lucas admits both that he failed to verify that the informant actually dialed the telephone numbers he said he was calling and that his reports referenced evidence that was not properly preserved, an omission that was complicated by the fact that his reports did not include any chain of custody information for the evidence.  (*Id*. at USA001-23385-90).  When called to task about claiming in his DEA-6 investigative report to have witnessed a drug exchange when Lucas did not actually see an exchange take place, Lucas defended his false reporting.  *See id*. at USA001-23417 (OIG: "You can't say that you witnessed an exchange that you didn't witness."  Lucas:  "I don't – I don't agree with that.").[3]

In the newly revealed documents, Lucas supervisor John Ferster enumerates numerous DEA policy violations and questionable practices committed by Lucas, especially with regard to his reporting.  (Exhibit C, John Ferster Interview at USA001-22840-22845).  In fact, concerns about Lucas' veracity were so severe that, according to one newly disclosed document, the Honorable Greg White, former United States Attorney for the Northern District of Ohio, states that he met with the DEA Detroit Region Assistant Special Agent in Charge Anthony Marrotta and DEA Cleveland Resident Agent in Charge John Ferster to convey to the DEA that Lucas always had problems with his cases, and Judge White put out a directive to the AUSA's that on

---

[3] A subordinate of Lucas', Greg Brodersen, explains that Lucas's reporting omissions were intentional:  when Lucas supervised Brodersen, Lucas expressly instructed him to keep his DEA-6 reports vague and eliminate the details.  (Exhibit II, Greg Broderson Interview at USA001-22810).  Assistant United States Attorney Becky Luztko similarly explains in her affidavit that when confronted with the lack of details in his reports, Lucas said something to the effect that he liked to leave himself wiggle room, rather than pin himself down with details. (Exhibit JJ, Rebecca Lutzko Affidavit at USA001-23489).

Lucas' cases, Lucas always needed to have other agents as witnesses to corroborate him.  (Exhibit D, Greg White Interview at USA001-23521).

The belatedly disclosed documents also indicate that Defendant Cross was investigated for repeated violations of making false statements and failing to follow instructions during the Mansfield investigation.  (Exhibit E, Cross OPR Report, 10/12/10).  According the new documents, those charges were sustained as well.  (Exhibit F, Cross suspension decision, 10/26/12).  Although this Court expressly relied on its finding that "Cross denies that he testified [that] DEA procedures were not followed in the Webb investigation," (Doc. 190 at 30), the new documents reveal that Cross now admits that due to an oversight, Bray was not searched after that deal, nor was he searched before the deal.  (Exhibit AA, Robert Cross Interview at USA001-28222-23; Exhibit B, Transcript of Lee Lucas Compelled Administrative Interview at 23440-42).  Cross also now admits that the call allegedly setting up the deal with Webb does not appear to be drug related.  (Exhibit AA, Robert Cross Interview at USA001-28223).

Among the new evidence, there is also further information about defendants' efforts to hide Bray's theft of government funds while he worked as an informant during this investigation.  Immediately after the alleged Mott deal, Bray claimed that he not only spent all of the money given to him, he also had to put in $20 of his own money.  But defendants Ansari and Verhiley found hundreds of dollars hidden in Bray's dashboard when they searched his car after the deal.  Bray then claimed that the money was left over from the deal and he was planning on returning it.

In the new documents, Verhiley now admits that although Bray initially claimed that the money found hidden in his car was left over from a deal, Bray confessed that he had stolen the buy money because he needed the money.  (Exhibit G, Tom Verhiley Interview at USA001-

8

23074).  Additionally, although Defendant Faith denied hearing about the stolen  money and claimed that if he had heard about the incident, "he would have terminated Bray immediately and possibly had him charged,"  (Exhibit H, Larry Faith Third Interview at USA001-22759), Lucas now insists that Faith was the one monitoring the wire during the exchange and Faith was the one who heard Bray's lies and was in a position to call Bray on it, based on the discrepancies he heard over the wire about how much Bray falsely claimed to have spent on the deal.  (Exhbit B, Transcript of Lee Lucas Compelled Administrative Interview at USA001-23424-28).  Finally, Lucas' supervisor, John Ferster, claims that although Lucas initially denied that Bray tried to steal any buy money and swore that defendants Ansari and Verhiley were lying about the theft, Lucas later came to Ferster's office crying and asking Ferster to "squash" the information about the theft, for fear it would jeopardize Lucas' promotion.  ((Exhibit C, John Ferster Interview at USA001-22842).

The new evidence also includes admissions by several defendants that they had even more information that their informant was compromised, long before plaintiff was arrested, yet they never documented or revealed that information to plaintiff.  Defendant Faith admits that while defendants continued to use Bray as an informant, METRICH (the Metropolitan Enforcement Team of Richland County) repeatedly informed Richland County Sheriff's Office that Bray was dealing his own drugs on the side.  (Exhibit I, Larry Faith Initial Interview at USA001-22754).  Faith never documented that information or revealed it to the suspects inculpated by Bray.  Likewise, defendant Metcalf admits that "Bray was probably dealing drugs himself while working as an informant for the RCSO and the DEA. . . ."  (Exhibit K, Charles Metcalf Initial Interview at USA001-22769).  After being instructed by the lead Assistant United States Attorney to stop

9

using Bray as an informant, Lucas not only failed to report it or inform his supervisors, he instead referred Bray to a different DEA special agent.  (Exhibit C, John Ferster Interview at USA001-22844 USA001-22844).

Additionally, new highly relevant evidence that was disclosed by the government includes several defendants admitting to testifying falsely in support of their false informant and/or swearing to a false affidavit:

- Lucas admitted that he testified falsely during the Nabors trial when he claimed that he bought 4½ ounces of crack from Ronald Davis (a.k.a. Herman Price) for $3200 at around the same time as the Ballard deal.  (Exhbit B, Transcript of Lee Lucas Compelled Administrative Interview at USA001-23405).  This was very significant false testimony because there was a transcript of a telephone call in which a stand-in impersonator for Ballard inadvertently referred to Ballard in the third person, but Lucas changed that transcript to say that it was a phone call with Davis rather than Ballard.  For that lie to be convincing, Lucas had to change the amounts at issue and the timing of the Davis deal (which was actually a month later), which Lucas now admits that he did through his false testimony.

- Defendant Ansari also newly reveals false testimony in support of Bray.  For instance he testified before the grand jury that Albert Lee was present during the deal attributed to Nabors, where Ansari participated undercover.  (Exhibit O, Ansari Grand Jury Testimony at USA001-12556).  In the new documents, however, Ansari admits that he never saw Lee, and he is adamant that Lee was not present.  (Exhibit P, Jamal Ansari Meeting and Information at USA001-22675-76).

10

At Nabors' trial, Ansari testified that he had a clean look at Nabors during the deal and that he was able to make an identification.  (Exhibit Q, Ansari Testimony in Nabors Trial at USA001-16477-78).  He now absolutely denies that he was able to identify Nabors.  (Exhibit P, Jamal Ansari Meeting and Information at USA001-22675-76; Exhibit R, Jamal Ansari Interview at 22684-85; Exhibit S, Jamal Ansari Second Interview at 22692; Exhibit T, Jamal Ansari Affidavit at 27709).  Ansari also now admits that his testimony during the Nabors trial about how he obtained the drugs during that transaction was false. (Exhibit R, Jamal Ansari Interview at USA001-22683).

- Metcalf newly reveals that he testified falsely during the Geneva France/Ronald Davis trial in support of defendants' false informant.  At the criminal trial, Metcalf testified that he followed Davis from Davis' home to the meet spot at 187 South Adams Street.  (Exhibit J, Metcalf Testimony in France Criminal Trial at USA001-562).  Metcalf now admits, however, that he dropped surveillance and never went to Adams Street.  (Exhibit L, Charles Metcalf Second Interview at USA001-22776, Exhibit K, Charles Metcalf Initial Interview at 22770).  Metcalf also admits that when he went to a state judge with his affidavit for a search warrant for suspect Nabors' house, the affidavit falsely stated that the video taken at the first delivery recorded the buy. (Exhibit M, Charles Metcalf Third Interview at USA001-22782).

- Defendant Faith's new admissions prove that he made false statements in his affidavit for a search warrant in the Davis case.  Despite now admitting that he and Metcalf did not go by the house at 121 Glessner Avenue before the deal (Exhibit I,

11

Larry Faith Initial Interview at USA001-22752, Exhibit H, Larry Faith Third Interview at 22758), in his search warrant affidavit, Faith averred, "THE AFFIANT HAD DRIVEN BY 121 GLESSNER AVE. JUST PRIOR TO THE PURCHASE AND OBSERVED THE OLDER MODEL SILVER CHEVY CAPRICE SITTING IN THE DRIVEWAY."  (Exhibit N, Faith Search Warrant Affidavit at USA 001-9796). Faith also falsely averred, ". . . LUCAS AND AGENT PICKED UP A BLACK FEMALE STANDING IN FRONT OF 121 GLESSNER AVE. . . . THIS WAS WITNESSED BY BOTH THE AFFIANT AND DET. METCALF."  (*Id.* at USA001-9795).

Additionally, in response to summary judgment in this case, plaintiff presented considerable evidence from multiple experts indicating that the audio recordings allegedly inculpating him were improperly altered.  (Doc. 181-6, 181-8, 181-9).  The doctoring of transcripts to support the false claims of defendants' informant was an issue throughout defendants' investigation, supporting that defendants intentionally altered the recording in this case.  In the new disclosure, the government produced a transcript of an audio recording that indicates the prevalence of this misconduct and defendants' direct involvement.  In the recording, Defendant Mayer promises to erase certain parts of a recording and suggests that such doctoring of the recordings was commonplace and a reasonable expectation on the part of the informant:

BRAY: Here's your recorder.  It's still on . . . .

LUCAS: Was that on while were just talking all that shit?

BRAY: Yeah.

LUCAS: Shit.

12

UNIDENTIFIED: Fuck.

BRAY:   So we ga – he'll erase it.

MAYER: I'll fix it.

(laughter)

(Exhibit B, Transcript of Lee Lucas Compelled Administrative Interview at  USA001-23838).

Finally, the new documents reveal numerous new incidents of false reporting by the defendants throughout their investigation, in furtherance of the charade that their informant was credible and reliable.  Examples include:

- RCSO Detective Dawn Brown indicates that Lucas made numerous false claims in his DEA-6 reports bolstering the evidence in the supposed Nabors deal.  Brown and Lucas conducted surveillance together, and she claims that Lucas' report makes false statements about how she and Lucas could corroborate Bray. C*ompare* Exhibit U, Dawn Brown Interview at USA001-22746-8; Exhibit V, Documents Used During Lucas Compelled Administrative Interview at USA001-23243-47.

- Defendant Ansari claims that Lucas used false reporting in order to falsely suggest that Ansari could corroborate the identifications in the deal attributed to Nabors and also to supply numerous patently false details in support of that transaction. *Compare* Exhibit P, Jamal Ansari Meeting and Information at USA001-22675-76; Exhibit R, Jamal Ansari Interview at 22682-84; Exhibit S, Jamal Ansari Second Interview at 22692; Exhibit W, Jamal Ansari Third Interview at 22702; Exhibit T, Jamal Ansari Affidavit at 27709; Exhibit V, Documents Used During Lucas

13

Compelled Administrative Interview at USA001-23243-47. .  Lucas, however, insists that Ansari identified Nabors and that Ansari reviewed the DEA-6 claiming that Ansari made the identification.  (Exhibit B, Transcript of Lee Lucas Compelled Administrative Interview at USA001-23430).

- Additionally, according to Ansari, Lucas' DEA-6 implicating Robertson is false. Lucas reports that Ansari (who participated in the deal directly, undercover) observed the drug dealer give the money from the deal to Robertson.  (Exhibit X, Lucas DEA-6 Report at USA001-6797).  Ansari denies that this money transfer occurred and denies that he ever told Lucas that it occurred.  (Exhibit T, Jamal Ansari Affidavit at USA001-22711).  In fact, according to Ansari, not only was no money given to Robertson, the dealer expressly said that Robertson had nothing to do with the deal and Robertson rebuffed Ansari's efforts to engage him.  (Exhibit R, Jamal Ansari Interview at USA001-22686; Exhibit S, Jamal Ansari Second Interview at 22693).

- Defendant Faith admits that Lucas put false corroborating facts, attributed to Faith, in the DEA-6 investigative report regarding the purported Davis deal.  Specifically, Faith states that he and Defendant Metcalf did not go to the house at 121 Glessner Avenue (believed to be Davis')  that day and did not know whether Davis or his car were at the house on the day of the buy.   (Exhibit I, Larry Faith Initial Interview at USA001-22752; Exhibit H, Larry Faith Third Interview at 22758).  In contrast, Lucas' DEA-6 report of that transaction states, ". . . Larry Faith observed DAVIS depart 121 Glessner Avenue, Mansfield, Ohio, driving a silver Lincoln,

14

Ohio tag number DOJ-6183." (Exhibit Y, Sprint Information for Alleged Mott Phone at USA001-23721).

- Defendant Mayer also establishes the false reporting in support of the informant's reliability in Lucas' DEA-6 investigative reports. After the deal attributed to Ballard, Mayer and Lucas followed the suspects' two vehicles, but they were never able to get close enough to see the occupants. (Exhibit Z, Matt Mayer Second Interview at USA001-22765). However, Lucas' DEA-6 reports that, immediately after the deal, surveillance was terminated on the two vehicles allegedly used by the suspects and that Lucas and Mayer maintained surveillance on the informant until he arrived at a pre-determined meet location. (Exhibit V, Documents Used During Lucas Compelled Administrative Interview at USA001-23199-23200). Lucas reports that during the Nabors deal Mayer observed a specific car with a specific license plate arrive and suspects approach the informant. (*Id*. at USA001-23244). Mayer denies seeing the car and the people. (Exhibit Z, Matt Mayer Second Interview at USA001-22767).

- Metcalf reveals that Lucas' DEA-6 investigative report of the alleged Nabors deal falsely claims that Metcalf identified Nabors. Metcalf admits that "he personally did not see Nabors at either one of the buys." (Exhibit K, Charles Metcalf Second Interview at USA001-22773). Lucas' report, however, repeatedly claims that Metcalf observed Nabors during the transaction. (Exhibit V, Documents Used During Lucas Compelled Administrative Interview at USA001-23244).

- Similarly, Metcalf denies seeing anyone get into or out of the car during the deal

15

attributed to Danny Brown (Exhibit L, Charles Metcalf Second Interview at USA001-22777; Exhibit M, Charles Metcalf Third Interview at 22784), but Defendant Cross' DEA-6 investigative report of the deal claims that Metcalf witnessed an individual of a particular description entering and exiting the car. (Exhibit FF, Cross DEA-6 Report at USA001-2886).

- Metcalf admits that in the November 8, 2005 telephone calls attributed to Danny Brown – the only purported connection between Brown and the drugs delivered to Bray – the voice on the calls is not actually Brown's.  (Exhibit M, Charles Metcalf Third Interview at USA001-22784).  Nevertheless, defendant Cross states that the officers played those calls for Metcalf, and Metcalf claimed that the voice was Brown's.  (Exhibit AA, Robert Cross Interview at USA001-22823).

- Defendant Cross states that Lucas listed Cross as a corroborating witness in deals allegedly involving Mott, even though Cross was not present at those deals. (*Compare* Exhibit BB, Robert Cross Second Interview at USA001-22834; Exhibit V, Documents Used During Lucas Compelled Administrative Interview at  23189). Similarly, Lucas claims that Verhiley identified Roosevelt Williams, even though Verhiley denies that he did.  (*Compare* Exhibit G, Tom Verhiley Interview at USA001-23076; Exhibit V, Documents Used During Lucas Compelled Administrative Interview at 23255).

All of this false evidence was used to create a veneer of reliability around Bray, despite defendants knowledge that Bray was wholly unreliable.  Such evidence unmistakably supports a dispute of fact around defendants' participation in the charade.

16

**B.     Reversal Under is Warranted Because Defendants' New Disclosure Reveals That They Continue to Withhold Relevant Documents**

The new evidence also reveals that, in addition to misconstruing the extent of the disclosures to this Court, defendants' document disclosures are still incomplete.  Although defendants have repeatedly and falsely claimed to this Court that they have provided plaintiff, "the entire internal files of the United States Attorney's Office in Cleveland, United States Drug Enforcement Administration, Richland County Sheriff's Office and the other law enforcement agencies involved in the Mansfield cases," the new documents reveal that even the latest files tendered by defendants are nowhere near complete.  Doc. 158 at 11; *see also* Doc. 159 at 3; Doc. 160 at 2; Doc. 161 at 2.

Among the missing documents, newly revealed through this recent disclosure are:

a.      According to DEA policy, for each and every deal Bray participated in, a DEA form 356 (confidential source payment record), a DEA form 103 (voucher for purchase of evidence), a DEA form 12 (required for official authorized funds),  a DEA form 6a (delineating the specific funds used for the deal), and possibly a DEA form 499 (asset forfeiture award payments form) should have been generated. (Exhibit V, Documents Used During Lucas Compelled Administrative Interview at USA001-23330-37).  These documents are essential given plaintiff's allegations that defendants permitted Bray to steal government funds throughout the investigation.  Such allegations particularly resonate given newly disclosed interviews by the DOJ in which Bray reveals that defendants permitted Bray to keep money Bray stole from the deals on a number of occasions.  *See*, *e.g.*, Exhibit

17

CC, Jerrell Bray First Interview at USA-001-22309-11; Exhibit DD, Jerrell Bray Second Interview at 22320, 22322; Exhibit EE, Bray January 2009 Interview at 22389.  These omitted documents are also particularly important because the new documents reveal many monetary discrepancies between what defendants claim were spent on the buys and the funds actually accounted for.  *See, e.g.,* Exhibit B, Transcript of Lee Lucas Compelled Administrative Interview at USA001-23433, 23439, 23454.  Plaintiff has never received the DEA forms 356, 103, 12, or 499 for each deal.

b.  Additionally, DEA policy required Lucas to create a written "operational plan" for each and every deal conducted using Bray.  Plaintiff has never received any of these documents.  They are particularly important because they will likely reveal the discrepancies in Lucas' DEA-6 reports trying to mask which officers participated in the various deals and who was actually in a position to genuinely corroborate Bray.

c.  Under DEA policy 6612.92, the DEA maintained a confidential source file regarding Bray, which, on information and belief, would have included:  DEA form 473 (the confidential source agreement); quarterly debriefing reports (under DEA policy 6612.6); a deactivation report; DEA form 512 (an initial debriefing report).  (Exhibit V at USA001-23306-23350).  According to the DEA policy requirements, such documents are likely to reveal either that defendants were well aware of Bray's unreliability or were systematically burying the issues undermining his veracity.  Plaintiff has never received Bray's confidential source

18

file or any of the documents believed to be contained therein.

d.    DEA policy 6211.6 required preservation of all handwritten notes regarding all witness interviews and surveillance.  (*Id*. at USA001-23301).  Plaintiff has never received any such notes.  This is particularly important because such notes will likely show defendants' false corroboration of Bray inserted into the DEA-6 reports.

e.    There is reference to an FBI investigation "closing memo" regarding concerns around Lucas' veracity.  (Exhibit GG, Ron Bakeman Interview at USA001-23476).  This memorandum likely contains evidence relevant to plaintiff's allegations.

f.    The DEA and RCSO reports for the simultaneous arrest of most Operation Turnaround suspects, including plaintiff, on November 9, 2005.  There are almost no arrest reports included within the document disclosure.

g.    Any of the Ohio Bureau of Criminal Investigation and Identification ("BCI") reports generated during Operation Turnaround.  This is very important because much of defendants' subterfuge has come to light through cross-referencing the reports of the different agencies, and the BCI reports could similarly reveal the glaring discrepancies between the versions told by the different officers.  Defendants specifically informed the Court that they had tendered the entire files of "the other law enforcement agencies involved in the Mansfield cases," but no BCI files were tendered.  Doc. 158 at 11.

h.    In a newly disclosed document, there is reference to a memorandum from Lucas to AUSA Blas Serrano, around the time of the indictment, regarding the evidence of a

19

conspiracy among the suspects, including an annotated chart regarding each of the buys, and to an October 2005 "OCDETF" proposal drafted by Lucas regarding the Mansfield operation.  (Exhibit HH, Blas Serrano Interview at USA001-23493). Again, such evidence is likely to reveal the discrepancies in defendants' false reporting.

i.  Judge White (then U.S. Attorney) put out a directive to the AUSAs that on all of Lucas' cases, he needed to have other agents as witnesses to corroborate him due to concerns about Lucas' veracity. (Exhibit D, Greg White Interview at USA001-23521).  That directive is relevant to the allegations against Lucas and has never been tendered.

All of these profound omissions underscore the need to have defendants certify what they have and have not produced and to supply a privilege log for documents withheld under any privilege, something defendants have steadfastly refused to do.

To allow defendants to prevail on summary judgment, after they falsely informed the Court that they tendered complete files, yet withheld such an extensive and important set of documents would be supremely unfair.  Defendants should not be rewarded for their incomplete disclosures and their false representations to the Court.  Rather, summary judgment should be reversed so that the record can be fully established.

**C.  The Relevant Standards For Plaintiff's Fourth Amendment Claims**

The evidence presented above and the evidence still being withheld are directly relevant to plaintiff's Fourth Amendment and related conspiracy and *Monell* claims against all defendants.

### 1.     The Standards for Fourth Amendment Claims Generally

The Fourth Amendment requires that arrest warrants be issued only upon a showing of probable cause. *Greene v. Reeves*, 80 F.3d 1101, 1105 (6th Cir. 1996). Probable cause is established when "the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007), *quoting Henry v. United States*, 361 U.S. 98, 102 (1959). Probable cause depends on whether there was "reasonably trustworthy information" showing the defendant committed an offense. *United States v. Newsome*, 2012 WL 5440027, *1-2 (6th Cir., Nov. 8, 2012), *quoting Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Law enforcement officers are ordinarily entitled to rely on a judicially secured arrest warrant as sufficient evidence of probable cause, but if the grand jury proceedings were corrupted by an officer's perjury, fraud, or suppression of material evidence, the indictment cannot be used to establish probable cause. *See Hinchman v. Moore*, 312 F.3d 198, 205-6 (6th Cir. 2002). An officer cannot rely on a judicial determination of probable cause if he or she "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Ghaith v. Rauschenberger*, 2012 WL 3289922, *4 (6th Cir., Aug. 14, 2012), *quoting Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (internal quotation marks and citations omitted). *See also Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003), *citing Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989); *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999); and *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). An officer is not entitled to immunity when a reasonably well-trained officer in his position "would have known

21

that his affidavit failed to establish probable cause and that he should not have applied for the

warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Accordingly, investigating officers may be liable for a Fourth Amendment violation "for

making material false statements either knowingly or in reckless disregard for the truth to

establish probable cause for an arrest." *Vakilian*, 335 F.3d at 517, *citing Ahlers*, 188 F.3d at 373.

Additionally, "an officer's intentional omission of unsupportive facts" from a warrant application

may violate the Fourth Amendment.  *See United States v. Carpenter*, 360 F.3d 591, 600 (6th Cir.

2004) (Gilman, CJ, concurring).

Finally, arresting officers can be liable when they knew of the fraudulent procurement of

the arrest warrant.  *See Mott v. Lucas, et al.*, Case No. 1:10-CV-0164 (Pearson, J.) (appended),

Page ID# 1505, *citing Juriss v. McGowan*, 957 F.2d 345, 351 (7th Cir. 1992) (finding no

distinction between officers who procured a warrant and officers who executed the warrant

knowing it had been fraudulently procured),  *relying on United States v. Leon*, 468 U.S. 897, 923

(1984); *Smith v. Barber*, 195 F. Supp. 2d 1264, 1276 (D. Kan. 2002) (citing *Leon* and finding that

"[w]hen the executing officers knew the information upon which the warrant was based was

unreliable due to the well-known history of one of [the informants] and knew that the information

was un-corroborated," the officers were not shielded by the defense of a facially valid warrant);

*Gregory v. City of Louisville*, 444 F.3d 735, 759 (6th Cir. 2006) (finding that a plaintiff can

properly state a claim against an officer who did not testify in a probable cause hearing by

demonstrating that the falsely testifying officer's knowledge can be imputed to the non-testifying

officer).

In sum, to overcome each defendant's claim of qualified immunity, plaintiff was required

22

to make a two-part showing, creating a dispute of fact:  "that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and . . . that the allegedly false or omitted information was material to the finding of probable cause."  *Vakilian*, 335 F.3d at 517, *citing Hill*, 884 F.2d at 275 (citations omitted).

The government has conceded that Bray was "an essential witness to the charges" against plaintiff and that once Bray's credibility was called into question, the government could not support charges against any of the Mansfield investigation suspects without Bray.  (Doc. 181-11). Because plaintiff's arrests and prosecutions presented probable cause that was dependent on the reliability of defendants' confidential informant, "the veracity, reliability, and the basis of knowledge for that information" was a necessary consideration, as part of the totality of the circumstances for evaluating probable cause.  *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003), *citing Illinois v. Gates*, 462 U.S. 213, 230 (1983) (citations omitted).

### 2.  Malicious Prosecution

In this Circuit, a plaintiff's Fourth Amendment claims can also encompass claims for malicious prosecution.  *Army v. Collins*, 2012 WL 2913736, *2 (6th Cir., July 18, 2012), *quoting Sykes*, 625 F.3d at 308 (6th Cir.2010); *Stricker v. Township of Cambridge*, 2013 WL 141695, *12 (6th Cir., Jan. 14, 2013), *citing Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir.2007).  At the time of the defendants' misdeeds, it was clearly established law that a malicious prosecution claim arises when there was no probable cause for the initiation or continuation of charges against a plaintiff and defendants influenced that decision.  *Sykes*, 625 F.3d at 308.

### 3. Unlawful Detention

Under clearly established law, a Fourth Amendment claim can also encompass a claim for unlawful detention. *See, e.g., Drogosch v. Metcalf*, 557 F.3d 372 (6th Cir. 2009); *Myers v. Potter*, 422 F.3d 347 (6th Cir. 2005). A plaintiff can prevail on a claim for unlawful detention by demonstrating that defendants caused his continued detention notwithstanding the absence of probable cause. *Gregory*, 444 F.3d at 748.

### 4. Fabrication of Evidence

A Fourth Amendment claim can also include claims for fabrication of evidence. Clearly established law provides for a fabrication of evidence claim when a plaintiff can show the fabrication of probable cause, resulting in a seizure. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999) ("a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures.").

### 5. Conspiracy to Deny Fourth Amendment Rights

Finally, a § 1983 Fourth Amendment conspiracy claim can derive from defendants' plan to work together to violate a plaintiff's constitutional rights. *See, e.g., Weberg v. Franks*, 229 F.3d 514 (6th Cir. 2000). To plead a § 1983 conspiracy, a plaintiff must allege that: (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiff of his constitutional rights, and (3) an overt act was committed. *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). Thus, for a conspiracy to violate plaintiff's Fourth Amendment rights, he needs to show: (1) that defendants had a plan to violate his Fourth Amendment rights; (2) that defendants shared the conspiratorial objective of denying his Fourth Amendment rights; and (3)

24

that an overt act was committed in furtherance of this conspiracy.  *Id.*

Plaintiff was not required to prove an express agreement among all the conspirators, and "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved."  *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).  In establishing a genuine issue of material fact about the existence of defendants' conspiracy, plaintiff was entitled to "rely on circumstantial evidence to establish an agreement among the conspirators[.]"  *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012).

### 6.    In Sum

As detailed above, plaintiff was entitled to a trial on his Fourth Amendment claims if the evidence created a dispute of fact as to whether: (1) defendants' falsehoods, made knowingly or in reckless disregard for the truth, were material to probable cause; and/or (2) defendants influenced the initiation or continuation of charges against plaintiff without probable cause; and/or (3) defendants caused plaintiff's continued detention without probable cause; and/or (4) defendants fabricated probable cause, effectuating a seizure; and/or (5) defendants had a plan with a conspiratorial objective of violating plaintiff's constitutional rights, and an overt act was committed in furtherance of that conspiracy.

### D.    Reversal of Summary Judgment Is Warranted Based on the Improperly Withheld Evidence

The belatedly produced evidence is certainly sufficient to create a dispute of fact on plaintiff's claims, overcoming assertions of qualified immunity and warranting full discovery. Specifically, this Court's findings with regards to the claims against Defendant Lucas were premised on its contention that plaintiff failed to create a dispute of fact, sufficient to overcome an

assertion of qualified immunity, regarding whether Lucas intentionally hid information that vitiated probable cause.  (Doc. 190 at 27-28).  The new evidence, however, more than creates a dispute of fact about whether, throughout the entire Mansfield investigation, Lucas intentionally used false reporting to falsely corroborate Bray when he knew that Bray was being intentionally deceptive and was thoroughly compromised.  The evidence reveals that Lucas flouted DEA policy, and his veracity was so tainted by this investigation that Judge White issued a directive to prosecutors about that problem.  Additionally, Lucas admitted to his supervisor that he knew Bray used the investigation to steal money, but Lucas covered it up out of fear of jeopardizing his promotion.

The documents also reveal that Lucas now admits that he testified falsely during the Davis trial, a lie that corroborates a false transcript Lucas made in order to hide Bray's use of an impersonator in the alleged Ballard deal, which certainly creates a dispute of fact about whether Lucas knew during the Webb investigation that Bray was using impersonators to frame innocent suspects.  Lucas also participated in a conversation in which Mayer agreed to alter a recording to eliminate their conversation, which supports plaintiff's claims here, backed by three expert reports, that defendants doctored the recordings in this case in order to fabricate false evidence.

Additionally, numerous defendants and law enforcement witnesses have now accused Lucas of falsely claiming in his reports that they could corroborate Bray's claims, when the witnesses were not present or denied being able to offer any corroboration.  All of this new evidence creates a dispute of fact about whether Lucas fabricated probable cause in this case and conspired with Bray and the other defendants to frame plaintiff.

With regards to the other defendants, the new evidence shows their direct involvement in

26

this conspiracy to falsely bolster Bray's credibility, so that his framing of plaintiff would not be revealed and probable cause could be falsely established.  Quite troubling is the evidence that defendants concealed about Bray using his role as an informant to perpetuate thefts and drug dealing on the side.  The new documents inculpate Defendants Ansari and Verhiley, who now admit that they knew Bray was stealing, though this fact was never documented in any report.  Lucas also newly inculpates Defendant Faith in this coverup.  The new evidence also includes Defendant Faith's admission that he was informed by another law enforcement agency that Bray was dealing his own drugs on the side during this investigation, but that information was never documented or revealed to the suspects inculpated by the investigation.  Likewise, defendant Metcalf now admits that he was aware of Bray's sideline drug dealing business.

Equally troubling are all of the new admissions by defendants of false testimony given to bolster Bray's credibility, which contribute to a dispute of fact about whether defendants participated in this conspiracy.  The new evidence includes admissions by defendants Ansari, Metcalf, Lucas, and Faith regarding false testimony or false affidavits in support of the Mansfield investigation.  Such evidence supports a dispute of fact regarding defendants' participation in this conspiracy.

On a most basic level, such evidence all supports a dispute of fact about whether defendants' perpetuated falsehoods during the Mansfield investigation that were made knowingly or in reckless disregard for the truth and were material to probable cause.  This Court focused its summary judgment decision on the weight of defendants' evidence supporting probable cause, but respectfully, the standard at this stage is only whether plaintiff has presented sufficient evidence on the issue that, when fully credited, supports a dispute of fact about whether defendants falsely

established probable cause.  *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th Cir. 2006), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

And the new evidence does support such a dispute of fact.  Plaintiff presents mounds of evidence showing that defendants and their confidential informant manufactured probable cause through a series of falsehoods and omissions, throughout both the wider investigation and plaintiff's particular investigation, in order to maintain the illusion that the informant was reliable.  Such evidence creates a dispute of fact on plaintiff's Fourth Amendment claims, and summary judgment should therefore be reversed.  *See Alman v. Reed*, 703 F.3d 887, 896 (6th Cir. 2013) (when disputed factual issues underlie the probable cause analysis, "those issues must be submitted to a jury for the jury to determine the appropriate facts."); *see also Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts."); *Bazzi v. City of Dearborn*, 658 F.3d 598, 600 (6th Cir. 2011) (reversing summary judgment where, viewing the facts and inferences in the light most favorable to the plaintiff, a reasonable jury could find that the defendant officer lacked probable cause).

In its summary judgment rulings, the Court takes issue with "how Bray's misdeeds in other investigations support a finding of a constitutional violation of Webb's rights in this case." (Doc. 190 at 29).  But it is not Bray's misdeeds *per se* that support a constitutional violation here.  Rather, it is the evidence showing that defendants were using false reporting, perjurous testimony, deceptive affidavits, and doctored transcripts in an effort to hide Bray's duplicity that supports the constitutional violations here.  The newly presented evidence supports a dispute of fact that the defendants knew that neither Bray nor Lucas could support probable cause because, with the other

28

defendants' assistance, the two were constantly covering up Bray's schemes in order to falsely inculpate suspects and hide Bray's deceptions.  This dispute of fact defeats summary judgment.

At the end of the day, defendants are not entitled to summary judgment earned by hiding significant evidence relevant to the issue of qualified immunity while falsely telling the Court that all relevant files have been tendered in their entirety.  The Court and plaintiff were operating under the assumption that the original summary judgment briefing was done against a backdrop where plaintiff had all of the relevant documents, or at least a backdrop where defendants were not hiding a stack of documents that cast doubt on qualified immunity.  Plaintiff has consistently pushed for more discovery in this case, and the Sixth Circuit confirmed in the *Westerfield* appeal that discovery on the issue of qualified immunity is warranted, but this Court limited discovery, undoubtedly taking defendants at face value when they assured the Court that they had at least given plaintiff all of the documents relevant to qualified immunity.  Now that the falseness of that claim has been revealed, there is no sense to a ruling deciding qualified immunity without consideration of the relevant documents disproving immunity that defendants improperly withheld.  Such a ruling is unlikely to withstand scrutiny on appeal**.**

**Conclusion**

Defendants misinformed this Court about the extent of their discovery disclosures, and the documents defendants failed to produce support a dispute of fact about whether the defendants are entitled to qualified immunity on plaintiff's Fourth Amendment claims. The documents also reveal that defendants are still withholding huge categories of documents, relevant to the issue of qualified immunity, that defendants falsely claimed to have already produced. Defendants should not be rewarded for their deception in the district court. Summary judgment should be reversed and the pending motions filed by the various defendants (Doc. No. 193 and FTCA case [1:10-cv-1669] Doc. No. 23) should, except as expressly conceded in footnote 1, above, be denied.

RESPECTFULLY SUBMITTED,


/s/ Debra Loevy-Reyes
Attorneys for Plaintiff

Jon Loevy
Joel Feldman
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2013, I filed electronically a copy of the foregoing Plaintiff's motion for relief from summary judgment rulings.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Any other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

s/ Debra Loevy-Reyes\
Debra Loevy-Reyes\
LOEVY & LOEVY\
312 North May Street, Suite 100\
Chicago, IL 60607\
Ph. – 312-243-5900\
Fx. – 312-243-5902\
loevy@loevylaw.com